UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA


    v.                    Case No. 1:22-cr-00096-7-CKK

LAUREN HANDY
JONATHAN DARNEL
JAY SMITH (AKA JUANITO PICHARDO)
PAULA "PAULETTE" HARLOW
JEAN MARSHALL
JOHN HINSHAW
HEATHER IDONI
WILLIAM GOODMAN and
JOAN BELL

      Defendants.
_____/


### DEFENDANT IDONI'S MOTION TO DISMISS AND BRIEF IN SUPPORT THE INDICTMENT BECAUSE THE FACE ACT IS AN UNCONSTITUTIONAL CONTENT REGULATION OF SPEECH , IT DOES NOT RECOGNIZE THE PERSONHOOD OF THE UNBORN AND RESULTS IN GROSSLY DISPROPORTIONATE SENTENCING CONTRARY TO THE INTENT OF CONGRESS


NOW COMES Defendant, HEATHER IDONI, and moves the Court pursuant toLCrR 12.01(b) and Rule 12(b)(3)(A)(iv) of the Federal Rules of Criminal Procedure to dismiss the above-referenced Indictment.  FACE is invalid

1

because science is clear that the unborn child is fully human and fully alive in the womb, and thus the unborn child is a person protected in law. Additionally, Defendant, Heather Idoni, moves the Court to dismiss Count One, the conspiracy charge, on the ground that the penalty is disproportionate to the crime, and charging a felony conspiracy for the alleged misdemeanor FACE violation is contrary to the intent of Congress. She further moves for dismissal of the Indictment because the FACE Act violation charged is an unconstitutional content regulation of speech.

In further support hereof, the Defendant would show unto this Court the following.

## MEMORANDUM OF LAW

## ARGUMENT I

## I.   THE CONSPIRACY CHARGE SHOULD BE DISMISSED, THE PENALTY IS GROSSLY DISPROPORTIONATE, AND IT IS CONTRARY TO CONGRESS INTENT.

As a result of their actions in the proximity of an abortion clinic in Washington D.C., the Government has charged Lauren Handy, Jonathan Darnel, Jay Smith (Aka Juanito Pichardo), Paula "Paulette" Harlow, Jean Marshall, John Hinshaw, Heather Idoni, William Goodman, and Joan Bell with conspiracy "to injure, oppress, threaten, or intimidate" persons in the free exercise of their civil rights under 18 U.S.C. § 241. Indictment, Count I. By this means, the Government

has transformed a misdemeanor FACE violation into a serious felony conspiracy carrying a maximum sentence of ten years and a fine of up to $250,000. So for making an advance agreement or to try to dissuade women from having abortions is charged here as a felony with more than ten times the maximum penalty for the misdemeanor FACE violation and this is grossly disproportionate and unjust.

In addition, as stated previously, this entire case was undertaken for an improper motive, as retaliation for the Supreme Court's overruling <u>Roe v Wade</u> and <u>Planned Parenthood v Casey</u> in the <u>Dobbs</u> case. Indeed, Associate Attorney General Vanita Gupta instructed the DOJ's Civil Rights Division that in the wake of <u>Dobbs</u> enforcement of FACE was urgent.

The grossly disproportionate penalty the conspiracy Defendants face (no pun intended) here is virtually unprecedented. As of a Seventh Circuit has held, proper punishment for conspiracy is a function of the gravity of the crime the defendants conspired to commit." <u>United States v D'Antoni</u>, 874 F.2d 1214, 1221 (7th Cir. 1989). Inadequate punishment can work a miscarriage of justice just as excessive punishment can." <u>United States Id</u> at 1222.  Congress' intent behind the federal sentencing statute, 18 USC 3553, is among other considerations, the following:

> "The Court in determining the particular sentence to be imposed shall consider (6)? the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct....18 USC 3553(a)  (6)?.  What if in this case, we have two defendants engaging in the same conduct but because one is not convicted

of the conspiracy they get probation while
the others receive years in prison?"

It is noteworthy that 18 USC § 371, Conspiracy to Commit an Offense or to Defraud the United States could have been charged here, but that statute expressly **limits the punishment** such that is no greater than the punishment for the underlying misdemeanor. After setting forth the general penalty as an appropriate fine and/or imprisonment up to five years, it states: "If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, **the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.**" *Id.* (emphasis added); *see also* 18 USC § 373, Solicitation to commit a crime of violence (setting maximum punishment for conspiracy at one-half the maximum punishment for the crime). Thus, had the government charged these Defendants under Section 371, the punishment for the conspiracy would be no greater than the punishment for the misdemeanor. That is proportional for the conspiracy, that is justice. "The proper punishment for conspiracy is a function of the gravity of the crime the defendants conspired to commit," as Judge Posner rightly stated. But in the Government's zeal to punish all who dare oppose abortion, the proper punishment for conspiracy is ten years' imprisonment and a fine of $250.000. That is not justice, it is abuse.    Congress could not have been clearer in its intention that first offense violations of FACE be charged as misdemeanors. The Government's ginner up felony conspiracy charge

4

conflicts with both the spirit and the letter of FACE and is directly contradictory to the intent of Congress. The Government has protected FACE cases continuously over the entire twenty-nine (29) years since, both civilly and criminally. But never before, during that entire time, has the Government ever charged a conspiracy under Section 241 in connection with a FACE case, no matter how extreme the alleged violation. To employ it now, under these circumstances, suggests an ulterior motive, to say the least.

In conclusion, Count One of the Indictment, alleging a violation of 18 U.S.C. § 241 by these nine Defendants, should be dismissed.

## **ARGUMENT II**

## II. **THE UNBORN CHILD IS FULLY ALIVE AND FULLY HUMAN AND THEREFORE IS OR SHOULD BE PROTECTED UNDER LAW.**

Roe's recognition of a right to abort a previable pregnancy rested on the belief that the termination would not extinguish the life of a human person. That belief is no longer factually tenable given the current state of scientific knowledge concerning the origin and development of the human fetus. Roe also rested on a determination that the humanity and personhood of an unborn child was not generally recognized in law. That legal context has changed as well. Among other changes in the law, unborn babies are now protected as human beings under laws

prohibiting fetal homicide. *See, e.g.,* Planned Parenthood of Indiana & Kentucky, Inc. v Comm'r of Indiana State Dep't of Health, 888 F.3d 300, 319 (7th Cir.), *reh'g en banc granted, judgment vacated, 727 F. App'x 208* (7th Cir. 2018), *vacated*, 917 F. 3d 532 (7th Cir. 2018), *and opinion reinstated*, 917 F.3d 532 (7th Cir. 2018), *and cert. granted in part, judgment rev'd in part sub nom.* Box v Planned Parenthood of Indiana & Kentucky, Inc., 204 L. Ed.2d 78, 139 S. Ct. 1780 (2019) (Manion, J., concurring in part and dissenting in part) ("a supermajority of the States" recognize  "the dignity and humanity of the unborn" by "enforcing fetal homicide laws, the constitutionality of which has never been doubted").

Other laws, such as "heartbeat" laws and laws protecting against fetal pain, which are increasingly being enacted by the states, demonstrate their interest in protecting the youngest and most vulnerable humans. Finally, changes in the laws and the availability of social services that support and protect pregnant women have ameliorated the plight of pregnancy and lessened the burden of child-rearing. All of these changes robbed Roe, and FACE, of their factual and legal underpinnings.

    **A**.    **A consensus of biologists now acknowledges that a human fetus is biologically speaking, a human being.**

        **1.**    **The scientific literature has established that fertilization initiates a new human being.**

A review of recent discoveries and the development of scientific literature since Roe reveal a strong consensus that sperm-egg plasma membrane (fertilization) is the starting point of the life of a human organism (a human being). Dr. Maureen Condic, a member of the National Science Foundation's National Science Board, which "advises Congress and the Administration on issues in science,"[1] writes:

> From the moment of sperm-egg fusion, a human zygote acts as a complete whole....The zygote acts immediately and decisively to initiate a program of development that will, if uninterrupted by accident, disease or external intervention, proceed seamlessly through formation of the definitive body, childhood, adolescence, maturity and aging, ending with death. This coordinated behavior is the very hallmark of an organism.[2]

A human organism's self-directed "program of development" initiated by fertilization (sperm-egg fusion) is the human life cycle. A necessary and sufficient condition for an organism with human DAN to be classified as a human being is that it is developing in one of the stages of the life cycle initiated by fertilization. From a biological perspective, a human zygote (fertilized ovum) has a complete human genome, which will dictate its development and remain throughout the entirety of the human life cycle; a human zygote is a complete human organism.[3]

---

1 https://perma.cc/7UYH-UP7Z.

2 Maureen L. Condic, *When Does Human Life Begin, A Scientific Perspective,* WESTCHESTER INSTITUTE FOR ETHICS AND THE HUMAN PERSON, Oct. 2008, https://perma.cc/S4ZJ-AN67.[2]

3 The Supreme Court has recognized that human zygotes are organisms: "[B]y common understanding and scientific terminology, a fetus is a living organism while within the womb

Thus, a human zygote is as much of a human being as an infant, a teenager, or an adult -- a human zygote is simply a human being in a different stage of its development. Scientific articles routinely advance this view as an uncontroversial and basic fact of biology. "The life cycle of mammals begins when a sperm enters as an egg"[4] and "[f]ertilization is the sum of the cellular mechanisms that pass the genome from one generation to the next and initiate development of a new organism."[5]

### 2.    An  overwhelming majority of biologists recognize that a a human's life begins at fertilization.

A recent international study involving 5,577 biologists from 86 countries who work at 1,061 top-ranked academic institutions confirmed the scientific consensus on when life begins.[6] The study asked biologists to confirm or reject five statements that represent the view that a human's life begins at fertilization. The majority of the biologists in the study identified as liberal (89%), pro-choice (85%), and non-religious (63%).

---

whether or not it is viable outside the womb. *See*, e.g., Planned Parenthood [Federation of America v Ashcroft], 320 F. Supp. 2d,, at 971-972. We do not understand this point to be contested by the parties." Gonzales v Carharat, 550 U.S. 124 (2007).

4 Yuki Okada, Kazuo Yamagata, Kwonho Hong, Teruhiko Wakayama, & Yi Zhang, *A role for the elongator complex in zygotic paternal genome demthylation,* NATURE, 463 (7280):  554-8, Jan. 28, 2010, http://perma.cc/Y5YO-LCW3. [4]

5 Paul Primakoff & Diana G. Myles, Penetration, adhesion, and fusion in mammalian sperm-egg interaction, SCIENCE, 296 (5576): 2183-5, June 21, 2002, https://perma.cc/D2XU-F6sE.

6 Steven A. Jacobs, *Balancing Abortion Rights and Fetal Rights: A Mixed Methods Mediationi of the U.S. Abortion Debate, KNOWLEDGE@UCHICAGO,* 2019, https://perma.ccGZT2-8JDN.

5,337 biologists (96% affirmed at least one of the statements and only 240 participants declined to affirm any statements (4%). The study participants were also asked to answer an essay questions" "From a biological perspective, how would you answer the question, 'When does a human's life begin?" "Most biologists (68%) indicated fertilization. Thus, while in <u>Roe</u>, the Court found that experts could not arrive at any consensus at that point in the development of man's knowledge, that is no longer the case.

### 3. Legislative hearings on when life begins marshaled scientific evidence that life begins at fertilization.

During hearings conducted by the Senate Judiciary Subcommittee on Senate Bill 158, the "Human Life Bill", numerous scientific experts testified regarding when life begins. The official Senate Report concluded that: "Physicians, biologists, and other scientists agree that conception marks the beginning of the life of a human being - a being that is alive and is a member of the human species. There is overwhelming agreement on this point in countless medical, biological, and scientific writings."[7]

Experts from leading institutions have testified that there are no alternative theories on when a human's life begins in the scientific literature. Dr. Hymie

---

[7] Report, Subcommittee on Separation of Powers to Senate Judiciary Committee S-158, 97th Congress, 1st Session 1981, 7; similarly, in 2006, the legislature in South Dakota heard expert medical testimony on when human life begins and concluded that "abortion terminates the life of a unique, whole, living human being." Report of the South Dakota Task Force to Study Abortion, Submitted to the Governor and Legislature of South Dakota, at 13, Dec. 2005, <u>https://perma.cc/4Wf*-TNM3</u>.

Gordon, Professor of Medical Genetics and physician at the Mayo Clinic, testified: "I have never ever seen in my own scientific reading, long before I became concerned with issues of life of this nature, that anyone has ever argued that life did not begin at the moments of conception and that it was a human conception if it resulted from the fertilization of the human egg by a human sperm. As far as I know, these have never been argued against." *Id*, at 52. This lack of any published, let alone generally accepted, alternative scientific theories was also attested to by Dr. Micheline Matthew-Roth, a principal research associate in the Department of Medicine at the Harvard School. *Id*. at 41-42.

### 4.    Even doctors who perform abortions and proponents of abortion rights admit unborn children are human beings.

Many practitioners of abortion and supporters of abortion rights acknowledge human life begins at conception.[8]  Am I killing? Yes, I am. I know that."[9] Abortion rights supporter and ethicist Peter Singer has written that being "a member of a given species is something that can be determined scientifically, by an examination of the nature of the chromosomes in the cells of living organisms.

---

8 Derek Smith, Pro-Choice Concedes: Prominent Abortion Proponents Concede The Barbarity of Abortion, HUMAN DEFENSE INITIATIVE, Nov. 7, 2018, https://perma.cc/GXH8-MAUU. See also, *A New Ethic for Medicine and Society,* CALIFORNIA MEDICINE, Sept. 1970.
9 KVUE *Austin Interview of Dr. Curtis Boyd,* at 0:23, YOUTUBE, Nov. 6, 2009, https://perma.cc/GYB2-3YFY.

In this sense there is no doubt that from the first moments of its existence an embryo conceived from human and eggs is a human being.[10]

The preamble to the Constitution states that one of its primary goals is to establish  justice." Our Declaration of Independence guarantees the "right to life," and the Fifth and Fourteenth Amendments guarantees that no "person" shall be deprived of life without due process of law. The Sixth Circuit has recognized that "[i]dividuals have 'a clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity,' and this right is fundamental where 'the magnitude of the liberty deprivation that [the] abuse inflicts upon the victim...strips the very essence of personhood.'" Kallstrom v City of Columbus, 136 F.2d 1055, 1062-63 (6th Cir. 1998) quoting Doe v Claiborne Cnty., Tenn By & Through Claiborne Cnty. Bd. of Educ., 103 F.3d 495, 506-07 (6th Cir. 1996) (privacy in personal information case). "[I]t goes without saying that an individual's 'interest in preserving her life is one of constitutional dimension.'" Id., (quoting Nishiyama v Dickson County, 814 F2d 277, 280 (6th Cir. 1987) (en banc)).

Preborn human beings are persons entitled to the same inalienable and constitutional rights as post-birth human beings. Accordingly, to enforce FACE in

---

10 Peter Singer, *Practical Ethics*, 2nd ed., CAMBRIDGE UNIVERSITY PRESS, 85-86, 1993.

a manner condoning the killing of innocent human beings is unconstitutional, and again, the Indictment should be dismissed.

One line of cases addressing conspiracy holds that only those driven by a corrupt motive may be prosecuted for conspiracy. Originating in <u>People v Powell,</u> 63 N.Y. 88 (1875, "[u]nder this principle, such a motive could be easily demonstrated if the underlying offense involved an act clearly wrongful in itself; but it had to be independently demonstrated if the acts agreed to were wrongful solely because of statutory proscription." <u>United States v Feola</u>, 420 U.S. 671, 691 (1975) (citing also *Note, Developments in the Law*--Criminal Conspiracy, 72 Harv. L. Rev 920, 936--937 (1959). Defendants' motives were the antithesis of corrupt; they have instead dedicated themselves rather to sacrifice themselves in order to save others from mortal harm. The Government's overaggressive charge in this context is inexcusable and unjustifiable.

Unlike typical criminal statutes, FACE prohibits not all conduct interfering with access to "reproductive health services" but only those motivated by an improper motive. That improper motive, as shown previously, was opposition but only to abortion. Abortion no longer being protected in federal law, the Government cannot satisfy the *mens rea* requirement of Section 241, and that charge should be dismissed.

In conclusion, Count One of the Indictment, alleging a violation of 18 U.S.C. § 241 by these nine Defendants, should be dismissed.

## ARGUMENT III

**III.    THE FACE ACT IS AN UNCONSTITUTIONAL CONTENT-BASED REGULATION OF SPEECH.**

The FACE Act is facially unconstitutional because it discriminates against expressive activity based on content and/or viewpoint. The Indictment should be dismissed for this reason as well.

It is well settled that the protection of the First Amendment "does not end at the spoken or written word." Texas v Johnson, 491 U.S. 397, 404 (1989). Conduct, too, "may be sufficiently imbued with elements of communication to fall within the scope" of the First Amendment." *Id.* (cleaned up). The High Court "has repeatedly stated, these rights are not confined to verbal expression. They embrace appropriate types of action . . ." Brown v Lousiana, 383 U.S. 131, 141--142 (1966) Hence, the Supreme Court has:

> "recognized the expressive nature of students wearing of black armbands to protest American military involvement in Vietnam, Tinker v Des Moines Independent Community School Dist., 393 U.S. 503, 505, 89 S. Ct. 733, 21 L. Ed.2d 731 (1969); of a sit-in by blacks in a "whites only" area to protect segregation, Brown v Louisiana, 383 U.S. 131, 141-142, 86 S. Ct. 719, 723-24, 15 L.Ed 2d 637 (1966); of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam, Schacht v United States,

> 398 U.S. 58, 90 S. Ct. 1955, 26 L.Ed2d 44 (1970); and of
> picketing about a wide variety of causes, *see, e.g.,* <u>Food
> Employees v Logan Valley Plaza, Inc.</u>, 391 U.S. 308, 313-314,
> 88 S. Ct. 1601, 1605-06, 20 L.Ed 2d 603 (1968); <u>United States
> v Grace</u>, 461 U.S. 171, 176, 103 S. Ct. 1702, 1706, 75 L.Ed 2d
> 736 (1983)."

*Id; see also* <u>Speet v Schuette</u>, 726 F.3d 867, 878 (6th Cir. 2013) (finding that "begging, or the soliciting of alms, is a form of solicitation that the First Amendment protects"); <u>Knight v Montgomery County, Tennessee</u>, 470 F. Supp. 3d 760, 767-68 (M.D. Tenn. 2020) (holding that plausible case exists for contention that "live streaming qualifies as expressive conduct"). Consequently, "[t]he First Amendment generally prevents government from proscribing speech...or even expressive conduct...because of disapproval of the ideas expressed." <u>R.A.V. v City of St. Paul</u>, 505 U.S. 377, 382 (1992) citations omitted).

"The First Amendment...prohibits the enactment of laws 'abridging the freedom of speech.'" <u>Reed v Town of Gilbert, Ariz.</u>, 576 U.S. 155, 163 (2015) (quoting U.S. Const., Amdt. 1). The Government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." <u>Police Dept. of Chicago v Mosley</u>, 408 U.S. 92, 95 (1972). "Content-based laws-- those that target speech based on its communicative content--are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." <u>Reed</u>, 576 U.S. at 163

(citations omitted). If a restriction on speech is content based, strict scrutiny is applied, and the restriction "survives only if it 'narrowly tailored to be the least-restrictive means available to serve a compelling government interest.'"  McGlone v Metro. v Metro Gov't of Nashville, 749 F. App's 402, 405 (6th Cir. 2018) (quoting Bible Believers v Wayne Cty, 805 F.3d 228, 248 (6th Cir. 2015) (en banc)). And it is the Government, not the Defendants, that carries the burden to prove narrow tailoring and a compelling government interest. McGlone, 749 F. App'x at 409.

### A. Reed and McCullen changed the landscape on content neutrality.

Reed, together with McCullen v Coakley, 573 U.S. 464 (2014), clarified that a regulation of speech is facially and *objectively* content based when it defines "regulated speech by a particular subject matter", or, "more subtle[ly]," when it regulates speech based on "its function or purpose," even when there is no invidious intent.  Reed, 576 U.S. at 163, 165-66. Further, a law is content based if enforcement authorities must "examine the content of the message that is conveyed to determine whether a violation has occurred." McCullen, 573 U.S. at 479.

### FACE is content based.

The FACE Act does not prohibit all interference with individuals near abortion clinics, but only those who do so *because* that person is "obtaining or providing reproductive health services."  18 USC § 248(a)(1) (emphasis added).

Accordingly, the Government must examine the content of Defendants' messages to determine their motivation before applying FACE. Such a determination renders the law content-based on its face under McCullen and Reed. Had the exact same actions that Defendants are alleged to have committed were undertaken not by pro-life advocates, but by, for example, a Black Lives Matter group upset with a White abortionist and an all-White staff, it would *not* violate FACE. Or again, a sit-in by a group of Martin Luther King, Jr. followers who object to the facility not treating African Americans would not violate the Act, even though their conduct was *identical* to that of the Defendants. Their actions would not have been undertaken because the objects of their protest were "obtaining or providing reproductive health services," but because of their race.

The Senate was clear in its discussions and careful in its drafting to specifically *exclude* certain actors from the reach of FACE.

> Thus, for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would not violate this Act (though their conduct might violate some other law, such as a local trespass law). In that example, **the demonstrators' motive** is related to the facility's emissions policy and practices and **not** to its policy and practices on abortion-related services. **The Committee has concluded that inclusion of the motive elements is important to ensure that the Act is precisely targeted at the conduct that**, as the Committee's record demonstrates, **requires new Federal legislation; deliberate efforts to interfere with the delivery of abortion-related services.**

16

S. Rep. No. 103-117, 103rd Cong., 1st sess. 24 (1993) (emphasis added). Again, not all physical obstruction is prohibited under FACE;    only that undertaken for purposes with which the Government disagrees, i.e., pro-life purposes. FACE is not content neutral.

The Sixth Circuit has held that a regulation of speech cannot draw distinctions based on the content of the speech. In Wagner v City of Garfield Heights, 675 F. App's 599 (6th Cir. 2017), the court first held that a municipality's ordinance restricting the size of *political* signs but not other signs was content neutral and thus warranted only intermediate scrutiny, which the court found the city met. But after the Supreme Court's decision in Reed was handed down, the High Court reversed and remanded Wagner. On remand, the Sixth Circuit found the ordinance to be content of the speech to determine whether the ordinance applied was "determinative," not merely "indicative" of whether the restriction was content based. *Id.* At 604. To hold otherwise, the Sixth Circuit noted, "appears to run afoul of Reed's central teaching." *Id.* The Court then applied strict scrutiny and held the ordinance was unconstitutional. *Id.*  at 606-07.

A law is content based on its face if, as Reed counsels, it "target[s] speech based on its communicative content; that is, it "applies to particular speech because of the topic discussed or the idea or message expressed." Reed, 576 U.S. at 163; *see also* City of Austin, Texas v Reagan Nat'l Advert. of Austin, LLC, 142 S. Ct.

1464, 1471 (2022) (same)[11], <u>Matal v Tam</u>, 582 U.S. 218, 218 (2017) (<u>Kennedy</u>, concurring in part, joined by <u>Ginsburg</u>, <u>Sotomayor</u>, and <u>Kagan</u>). Under <u>Reed</u>, FACE is content based on its face because it applies to particular speech - namely pro-life speech - because of the message expressed. It prohibits pro-life speech - because of the message expressed. It prohibits pro-life sit-ins, but not race-based sit-ins. Nor does it prohibit a pro-abortion sit-in, for example, an abortion facility's staff decided suddenly to cease doing abortions and a "Jane's Revenge" team came and blockaded the doors to protect the staff's decision.

B.    **FACE fails strict scrutiny.**

As a content-based regulation affecting speech, FACE must be subjected to strict scrutiny. That is, the restriction "survives only if it is narrowly tailored to be the least-restrictive means available to serve a compelling government interest.'" <u>McGlone v Metro. Gov't of Nashville</u>, 749 F. App'x 402, 405 (6th Cir. 2018) (cleaned up). The standard is a difficult one; "we readily acknowledge that a law rarely survives such scrutiny...." <u>Burson v Freeman</u>, 504 U.S. 191, 199-200 (1992). Here, the Government cannot show a *compelling* interest in preserving access to abortion-less "reproductive health services." After <u>Dobbs</u>, abortion can no longer be considered a part of "reproductive health care." All the evidence amassed to

---

11 *City of Austin* went on to distinguish laws which merely draw distinctions "only in service of drawing neutral, location-based lines" and are "agnostic as to content." *Id.* The distinctions FACE draws are emphatically message-driven and therefore content based, unlike the "location-based" distinction in *City of Austin.*

justify the enactment of FACE and to defend its constitutionality concerning women traveling interstate to obtain abortions because abortion facilities were not available in their state, or blockades by "anti-abortion" activists, etc., may no longer be considered.[12] Gutted of its abortion rationale, FACE lacks a compelling interest, and the Act fails strict scrutiny.

Even assuming *arguendo* that the Government could demonstrate a compelling interest necessitating FACE after Dobbs, it would still fail strict scrutiny because it is not the least restrictive means of serving that interest. There are numerous less restrictive means available to secure the interest, for example, in protecting sidewalk access and public safety, as the Supreme Court instructed in McCullen v Coakley, 573 U.S. 4464 (2014), such as enforcing already existing criminal laws prohibiting trespass, blocking of the sidewalk, threats of force, and so forth, or securing narrowly tailored injunctions, etc. In fact, the actions of the Defendants were adequately addressed by local law enforcement in Sterling

---

12 For example, the Sixth Circuit in Norton relied heavily upon the protection of abortion in upholding Congress' Commerce Clause authority to enact FACE:

> Express congressional findings underlying the Act plainly demonstrate that violate and obstructive acts directed at reproductive health facilities resulted millions of dollars in damage, forced reproductive health clinics to close, delayed medical services, and intimidated numerous physicians from offering **abortion** services. S.Rep No. 103-117, at 14 (1993); H.R.Rep. No. 101-306, at 7 (1993), reprinted in 1994 U.S.C.C.A.N., 699, 704. While the activity prohibited by the Act might be motivated by non-commercial sentiment--namely, **staunch moral opposition to abortion**--the effect of this activity is ambiguously and directly economic.

Norton v Ashcroft, 298 F.3d 547, 556 (emphasis added).

Heights and Saginaw and prosecution for violation of just such laws; FACE was entirely unnecessary here.

In addition <u>McCullen</u> requires that even content-neutral regulations of speech in the pu9blic forum not overly burden speech and be narrowly tailored to serve a valid government interest. The Supreme Court struck down the state statute in <u>McCullen</u> announced a hard and fast rule: "To meet the requirement of narrow tailoring, the government must demonstrate that alterative measures that burden substantially less speech would fail to achieve the government's interest, not simply that the chosen is easier." 573 U.S. at 495. The Government cannot satisfy this standard, either, once the abortion-protection rationale is removed from FACE. Indeed, protecting abortion was the *raison d'etre* for FACE; without it, FACE is nothing.

In short, FACE neither serves a compelling government interest nor employs the least restrictive means to serve any such interest. It therefore fails strict scrutiny and is unconstitutional on its face. The Indictment should be dismissed as content based.

## **CONCLUSION**

For all the foregoing reasons, Defendants respectfully move this Court for an order dismissing the Indictment and all charges in this case.

Dated:  May 2, 2023                             Respectfully submitted,


                                                   /s/ ROBERT J. DUNN, P33726
                                                  ROBERT J. DUNN, P33726
                                                  Attorney for Defendant
                                                  1413 Center Avenue
                                                  Bay City, Michigan  48708
                                                  989-894-1110



## **CERTIFICATE OF SERVICE**


I, Cynthia Eigner, hereby certify that the Defendant Idoni's Motion to Dismiss the Indictment and Brief in Support to Dismiss the Indictment because the FACE ACT is an Unconstitutional Content Regulation of Speech. It Does not Recognize the Personhood of the Unborn and Results in Grossly Disproportiante Sentencing Contrary to the Intent of Congress was electronically filed on this date with the Clerk of the Court and all the parties of the case by Robert J. Dunn's office, Attorney for Defendant and emailed to Heather Idoni.

DATED:  May 2, 2023                   /s/CYNTHIA L. EIGNER_____
                                                 CYNTHIA L. EIGNER
                                                 Legal Assistant to Robert J. Dunn