UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PAULA HARLOW (4),<br><br>Defendant | Criminal Action No. 22-096-4 (CKK) |

MEMORANDUM OPINION AND ORDER
(September 20, 2023)

Defendant Paula Harlow ("Defendant") is charged by indictment with (1) conspiracy against civil rights, in violation 18 U.S.C. § 241, and (2) obstructing access to a reproductive health clinic, in violation of 18 U.S.C. § 248. Defendant has moved in advance of trial to suppress testimonial statements she made to law enforcement during a custodial interrogation at a Metropolitan Police Department ("MPD") police station. The Court held an evidentiary hearing on June 7, 2023, at which, for the defense, only Defendant testified. In response, the Government presented one witness, Federal Bureau of Investigation ("FBI") Agent Nicole Miller, though it mainly relied on the video recording of the interrogation at question. Because, even taking Defendant's testimony as true, Defendant's admissions were voluntary, the Court **DENIES** Defendant's [212] Motion to Suppress Statements ("Motion" or "Mot.").

I. BACKGROUND

A. Indictment's Allegations and General Procedural Background

Although the Court assumes the reader's familiarity with this matter, the Court briefly reiterates its factual and procedural background. The operative indictment charges all ten Defendants with successfully scheming to disrupt access to a reproductive health clinic in the District of Columbia on October 22, 2020. *Id.* at 5. The Indictment alleges that Defendant Handy

1

orchestrated this conspiracy, directing her co-Defendants to undertake various preparations to blockade the clinic. *Id.* For example, Defendant Harlow allegedly brought with her a duffle bag containing chain and rope, which Defendants Smith, Harlow, Marshall, Hinshaw, and Bell used to block the clinic's doors. *Id.* at 6. For her part, Defendant Handy allegedly made an appointment at the clinic under a false name in order to ensure her entry and her co-conspirators' entry shortly thereafter. *See id.* at 4. According to the Indictment, at least Defendant Smith's entry was particularly violent, causing a nurse to stumble backwards and injure her ankle. *Id.* at 5. Defendant Handy then purportedly directed others to blockade the clinic's doors, locking staff in and potential patients out. *See id.* at 5-6. Meanwhile, Defendant Darnel allegedly live-streamed the incursion, telling listeners that he and co-conspirators had "intervene[d] physically with their bodies to prevent women from entering the clinic[.]" *Id.* at 6.

The Court severed the case into three trials: (1) an August 9, 2023 trial featuring Defendants Handy, Hinshaw, Idoni, Goodman, and Geraghty; (2) a September 6, 2023 trial featuring Defendants Darnel, Marshall, and Bell; and (3) an October 23, 2023 trial featuring Defendant Harlow. The tenth Defendant, Jay Smith, entered a plea of "guilty" on a superseding information on March 1, 2023. A jury returned a verdict as to the first group on August 29, 2023, finding each Defendant in that group guilty of each charge in the operative indictment, including a special finding that they used force against persons or property to achieve their unlawful ends. A verdict has been rendered in the second trial. The Court now resolves Defendant's suppression motion in advance of her trial.

### B. Background Specific to Motion to Suppress

The blockade of the clinic ended with Defendant's arrest at approximately 11:30 AM. ECF No. 220 at 2. MPD officers then transported Defendant to its Second District station for booking.

Hrg. Trans. at 13:7-10.  Defendant's Motion was initially predicated upon an assertion that some aspect of her subsequent interrogation was coercive, i.e., that "she was under the impression that if she cooperated by speaking with law enforcement officers, then she would be released from custody."  Mot. at 4.  This assertion changed somewhat at the suppression hearing.  There, Defendant testified that she was initially placed in a holding cell, at which point an unidentified police officer informed her that she would "be released" only if she talked to agents of the Federal Bureau of Investigation.  Hrg. Trans. at 15:3-4.  At some later point, MPD officers escorted Defendant to an interview room, where two FBI agents and an MPD detective commenced an interview with Defendant.  *Id.* at 17:13-21; Gov. Ex. 101.

The interview room fit four individuals comfortably.  Gov. Ex. 101.  All four were seated; a few feet of open space separated Defendant from law enforcement.  *Id.*  Defendant sat upright in a metal chair in the same clothes in which she arrived.  *See id.*  The only restraints used were metal handcuffs.  *Id.*  Directly to Defendant's left was a small metal table, on which she signed a standard "advice of rights" form, Gov. Ex. 102.  The two FBI agents were not visibly armed; the MPD detective had a holstered pistol affixed to his hip.  *See* Gov. Ex. 101.  Law enforcement was dressed in a combination of formal-business and business-casual attire.  *Id.*  After Defendant signed the form, the MPD detective asked if Defendant was "comfortable" and offered to remove Defendant's handcuffs.  *Id.*

Immediately after law enforcement entered the interview room, the lead FBI agent introduced himself and his colleagues, and asked Defendant "whether [she] wouldn't mind speaking with [them]."  *Id.*  Defendant nodded and then answered, "okay."  *Id.*  The lead FBI agent then presented Defendant with the "advice of rights" form.  *Id.*  When Defendant stated that she could not read the form without her glasses, the lead FBI agent read it aloud to her.  *Id.*  The lead

3

FBI agent first explained that Defendant "had the right to remain silent." *Id.* The agent asked whether Defendant understood that right, and Defendant nodded and answered affirmatively "mmhmm." *Id.* She then initialed next to the line to demonstrate that she understood. *Id.* She did the same when the lead agent voiced the remaining Miranda rights, including when the agent informed Defendant that she had "the right to stop answering at any time" if she chose to answer questions without her attorney present. *Id.* She then agreed that she understood her rights and that she was "willing to answer questions without a lawyer present." *Id.*

Defendant proceeded to answer a number of questions. *Id.* That changed when the interviewing agent posed questions regarding locks and chains that Defendant allegedly affixed to herself while inside the waiting room of the clinic. *Id.* When pressed on whether Defendant was "involved" with the locks and chains, Defendant responded, "that's all I want to answer." *Id.* Defendant then answered a number of other questions, in addition to describing, unprompted, her ideology and reasons for traveling to the District of Columbia. *Id.* When asked whether police instructed her to leave the clinic waiting room, Defendant responded, "I don't want to answer." Defendant then ended the interview, telling the interviewing agent, "I think we're all done." *Id.* At that point, she told law enforcement to investigate abortion and described her views on abortion. *Id.* Law enforcement then left the room, and questioning ceased. *Id.*

II.   **DISCUSSION**

Defendant broadly maintains that her admissions were involuntary, notwithstanding her subsequent *Miranda* waiver. Mot. at 4. Defendant's precise position is difficult to parse, however, because the instant Motion devotes little more than a paragraph to argument. *Id.* It appears that Defendant herself also shifted her account the day of the suppression hearing. According to defense counsel, rather than law enforcement having coerced Defendant into an admission in the

4

interrogation room, Defendant herself informed her counsel the morning of the suppression hearing that she had instead been coerced by the unnamed police officer outside her holding cell *before* she entered the interrogation room. Rough Trans. at 5. Taking Defendant's account as true, the Court understands Defendant to raise a modified *Seibert* challenge to her admissions. *See Missouri v. Seibert*, 542 U.S. 600 (2004).

Before reaching *Seibert*, the Court reiterates *Miranda*'s familiar holding that an admission is presumptively involuntary if it is the product of in-custody police interrogation without a *Miranda* warning. *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985). The parties agree that Defendant's admissions were elicited through custodial interrogation. *See* Gov.'s Opp., ECF No. 220 at 3. The only question, therefore, is the effectiveness of the interviewing agent's *Miranda* warning at the beginning of the custodial interrogation.

Defendant appears to maintain that the *Miranda* warning was ineffective due to the police officer's prior (purported) statement to the effect that Defendant would be unable to leave without first answering questions. Defendant would appear to liken this conduct to the sort of "two-step" interrogation held presumptively unlawful in *Seibert*. There, a plurality of the Supreme Court concluded that a confession after a *Miranda* warning is inadmissible if it follows a prior, coerced confession. *See* 524 U.S. at 612. Here, however, law enforcement did not interrogate Defendant before her entry into the interrogation room. At most, a police officer misstated the law, and the interviewing agent's methodical *Miranda* warning in the interrogation room more than adequately "counter[ed] any probable misimpression" conveyed by the alleged police officer outside Defendant's holding cell. *See id.* at 616; *cf. also United States v. Redrick*, 48 F. Supp. 3d 91, 109-10 (D.D.C. 2014) (statements during custodial interview after *Miranda* warning admissible notwithstanding earlier, unwarned admissions made in noncoercive atmosphere). Even had there

been an earlier, unwarned interrogation, there is no indication that such a "two-step interrogation technique was used in a calculated way to undermine the [subsequent] *Miranda* warning.'" *See United States v. Straker*, 800 F.3d 570, 617 (D.C. Cir. 2015) (quoting *Seibert*, 524 U.S. at 622 (Kennedy, J., concurring)). Moreover, the second interaction was led by a different law enforcement agency unaware of the prior alleged interaction and in an entirely different setting. *See id.* at 618.

Furthermore, the record is utterly devoid of coercion during the custodial interview. Clear video evidence demonstrates that Defendant sat comfortably in a chair in only minor restraints. When law enforcement asked whether she was comfortable and offered to remove her handcuffs, Defendant demurred. This police environment—entirely standard, if not banal—cannot come close to dispelling the presumption of voluntariness that comes with an effective *Miranda* warning. *See Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare[.]"). The circumstances suggesting involuntariness are severe indeed, usually involving real or threatened violence. *See United States v. Karake*, F. Supp. 2d 8, 51-52 (D.D.C. 2006) (ESH) (collecting cases).

It is also evident that Defendant's *Miranda* waiver was knowing and intelligent. After articulating each right, the interviewing agent asked Defendant whether she understood each of them. Defendant answered in the affirmative, also initialing the "advice of rights" form. She clearly understood her rights well enough to answer certain questions and not others, and affirmatively end the interview. *See Straker*, 800 F.3d at 625 (exercising Fifth Amendment right demonstrates understanding of the right). Overall, Defendant has not and cannot identify any factual circumstance demonstrating that her "will [was] overborne and [her] capacity for self-

determination [was so] critically impaired" that her *Miranda* admissions and waiver was involuntary. *See Colorado v. Spring*, 479 U.S. 564, 574 (1987) (internal quotation marks omitted).

### III.   CONCLUSION

Accordingly, and for all the foregoing reasons, the Court concludes that Defendant's admissions were voluntary. Therefore, it is hereby

**ORDERED**, that Defendant's [212] Motion to Suppress Statements is **DENIED**.

**SO ORDERED.**

Dated: September 20, 2023                              /s/
                                                                         COLLEEN KOLLAR-KOTELLY
                                                                         United States District Judge