UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>PAULA "PAULETTE" HARLOW,<br><br>Defendant. | Criminal Action No. 22-096-4 (CKK) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
(November 16, 2023)

A four-day bench trial in this criminal matter concluded on October 26, 2023. Defendant Paula Harlow ("Defendant") is charged by indictment with (1) conspiracy against civil rights, in violation 18 U.S.C. § 241, and (2) obstructing access to a reproductive health clinic, in violation of 18 U.S.C. § 248. In support of its case, the Government introduced testimony from seven witnesses: (1) Sarah Compton; (2) Sasha Proctor; (3) Caroline Davis; (4) Ashley Jones; (5) Special Agent Michael Biscardi of the Federal Bureau of Investigation ("FBI"); (6) Officer Homere Whyte of the Metropolitan Police Department ("MPD"); and (7) Tina Smith. Defendant presented a case, calling three witnesses: (1) co-Defendant Jean Marshall; (2) co-Defendant Joan Bell; and (3) herself. Additionally, the Court admitted sixty exhibits into evidence in full. Lastly, at the close of the Government's case and her own case, Defendant moved for a judgment of acquittal as a matter of law pursuant to Federal Rule of Criminal Procedure 29. That motion remains pending before the Court.

Based on the following findings of fact and conclusions of law, the Court **DENIES** Defendant's Rule 29 motion by separate order.

The Court finds Defendant Paula "Paulette" Harlow **GUILTY** on Counts One and Two of the Superseding Indictment, the Government having carried its burden beyond a reasonable doubt as to each element of each charge.

1

In reaching a decision on the following findings of fact and conclusions of law, the Court has considered the pleadings, the record, testimony, the parties' stipulations, the demeanor of the witnesses while testifying, the reasonableness of or unreasonableness of the testimony, the probability or improbability of the testimony, and all reasonable inferences to be drawn therefrom, among all other matters bearing on the credibility of the witnesses and the facts, and exhibits in evidence. The Court credits the following testimony and evidence as undisputed and/or unrebutted.

## I.     FINDINGS OF FACT

On October 22, 2020, Defendant invaded a reproductive health clinic in Washington, DC with her nine coconspirators to halt, for as long as possible, pregnancy-termination procedures scheduled for that day. To do so, Defendant jostled past three employees attempting to keep the flood of obstructionists out, later body-slamming the clinic manager into a waiting-room chair. With a bike lock affixed to her neck, Defendant then chained herself to four of her coconspirators and blocked the main entrance to the clinic's medical procedure area. Gov.'s Ex. 1011. When Officer Whyte turned to her and her coconspirators to direct them to exit the clinic, Defendant responded, "we can't move; we have the bike locks, so we can't move." *Id.* In Defendant's words, the purpose of the blockade was "to save lives." *Id.* In her view, God directed her to "rescue those who are being unjustly led to slaughter." Gov.'s Ex. 1013. Therefore, she would "not follow an unjust law" that, she understood, mandated she leave the clinic. *Id.* Ultimately, this joint endeavor succeeded in shutting the clinic down for approximately two-and-a-half hours. *Compare* Gov.'s Ex. 1001 (entry) *with* Gov.'s Ex. 1015 (exit).

### A. Conspiracy

The conspiracy to disrupt the clinic began with the conspiracy's leaders, Defendants Lauren Handy and Jonathan Darnel. Handy is a major fixture in the pro-life community in the District of Columbia, having founded a pro-life organization called "Mercy Missions." 10/25/23 Trans. at 157:9-14. On September 11, 2020, Handy began discussing an event with Darnel sponsored by Mercy Missions to discuss forthcoming "nonviolent direct action," i.e., "civil disobedience," also termed a "traditional rescue." *Id.* 158:5-12. A "traditional rescue," Handy explained to responding officers on the day of the incursion, entailed "blocking [the entrance to]" an "abortion facility" to "not allow people to go inside." Gov.'s Ex. 1009. Handy and Darnel then began promoting this event in various social-media groups broadly centered in the Washington, DC area. *Id.* at 159:3-163:2. Each reached out directly to individuals from across the United States, including Joan Bell. *Id.* at 167:18-23.

On or before October 16, 2020, Bell told Handy that she, co-Defendant Will Goodman, and "two [other] people" "want[ed] to risk arrest," i.e., join in a "traditional rescue." *See id.* at 167:13-23; Gov.'s Ex. 5083. Bell testified at trial that two other people drove with her from Massachusetts and New Jersey to the District of Columbia to participate: Harlow and Marshall. 10/25/23 Trial Trans. at 21:10-12. From this testimony, it is crystal clear that Bell discussed a forthcoming "traditional rescue" with Marshall and Harlow, and the three of them collectively decided to join in that upcoming blockade by traveling to the District of Columbia together. As the Court discusses further below, it is also clear that Bell discussed with Marshall and Harlow her plan to use locks and chains to block the clinic entrance prior to their departure for the District of Columbia.

3

Handy informed Bell that the initial rally point was the home of a local pastor. As Caroline Davis, a cooperating coconspirator, explained, Harlow, Bell, and Marshall arrived early enough to participate in the discussion setting out the plan for disrupting the clinic the following day.[1] There, Handy and Darnel explained that there would be two groups: (1) less obstructive protestors outside to "counsel" women entering the building that housed the clinic, and (2) activists inside or directly outside the clinic who would disrupt the clinic's operations. This latter group would engage in a "traditional rescue," which Davis understood to mean "block[ing] the doors for as long as possible" to prevent the termination of a pregnancy. 10/24/23 Trial Trans. at 15:1. Handy termed this planned rescue in another way: "risking arrest." *Id.* at 24:22. Handy and Darnel then asked attendees to raise their hands if they intended to risk arrest through, at the very least, "blocking the doors of the abortion clinic." *Id.* at 25:3. Defendant's sister and coconspirator, Marshall, further testified that Harlow intended to "risk arrest." 10/24/23 Trans. at 257:15-18. Davis further testified that a group of older women (clearly Harlow, Bell, and Marshall) advocated the additional use of locks and chains. *Id.* at 28:14-20. Further tactics were discussed, including "going limp" during arrest and Handy's use of a fake appointment to gain entry. *Id.* at 31:10-14. That said, Davis understood that the conspirators would limit themselves to nonviolent means of obstruction, though there was some concern that co-Defendant Smith, a recent "convert," might resort to force. *Id.* at 68:22-25. After this discussion, the meeting concluded, and Bell, Marshall, and Harlow left for housing that Handy had booked on their behalf.

---

[1] Marshall, Bell, and Harlow testified, contrary to Davis' representations, that they arrived too late at the house to meaningfully participate in the meeting. For the reasons discussed below in subpart I.C, the Court discredits this testimony and credits Davis' testimony.

4

The following morning, the charged defendants and other uncharged coconspirators met outside a coffee shop near the clinic to have one last discussion as to the planned blockade. 10/25/23 Trial Trans. at 107:1-5 (suggesting meeting place was outside a "coffee house" or "restaurant"); Gov.'s Ex. 2017; Gov.'s Ex. 2015.  Bell brought to this final meetup a bag containing the chains, locks, and ropes.  *See* 10/25/23 Trial Trans. at 27:23-24.  The bag was entrusted to Harlow at one point, the bag placed at her feet.  Gov.'s Ex. 2017.  After additional discussion, the group departed for the clinic to begin successfully obstructing the clinic's operations.  *See* 10/24/23 Trial Trans. at 63:18-21.

### B. Obstruction and Violence

Upon arriving at the building housing the clinic, the group split into three.  First, Handy entered the building and went to the clinic's main entrance in an effort to gain entry using her fake appointment.  Second, Harlow, Bell, Marshall, Idoni, Goodman, and Geraghty hid in an adjoining stairwell (used as a fire escape) to avoid detection, waiting for the clinic door to open so that they could rush in.  *See* 10/25/23 Trial Trans. at 122:6-11; Gov.'s Ex. 1079A.  Third, activists who did not intend to actively blockade the clinic and Darnel stood outside the building housing the clinic, waiting for the blockade to begin.  *See* Gov.'s Ex. 1017.

Shortly before 9:00 AM, the time the clinic was set to open, Handy attempted to enter using a fake appointment she made under the name "Hazel Jenkins."  10/23/23 Trial Trans. at 83:6-11.  This ruse was less successful than planned, because the clinic manager, Ms. Smith, recognized Handy from a prior incursion into the clinic a year earlier.  *See* 10/25/23 Trial Trans. at 116:11-13.  Nevertheless, shortly after Handy lied to clinic staff, they opened the clinic door for patients with appointments.  Gov.'s Ex. 1079A.

As patients entered, Harlow fastened a bike lock around her neck with Bell's assistance. Gov.'s Ex. 1079A. Harlow, wielding the bag of locks and chains, and Bell then followed their coconspirators in forcing their way into the clinic. *Id.* After the first two patients entered at approximately 9:05 AM, clinic staff attempted to shut the door on Handy and Smith. Gov.'s Ex. 1001. Smith fought against one nurse, shoving the door open and the nurse backwards, causing the nurse to severely sprain her ankle. *See id.* (scuffle); 10/23/23 Trial. Trans. at 45:23-25 (sprain). A melee ensued, and the clinic manager rushed from the medical procedure area into the waiting room with a broom to attempt to erect a barrier separating the two patients from Handy, Smith, and their coconspirators. Gov.'s Ex. 1001. The clinic manager was not successful. *Id.* Bell slipped through an opening, and dragging Harlow with her while Smith fought with the nurse. *Id.* As the clinic manager attempted to stand her ground, a much larger Harlow purposefully fell on top of the clinic manager, forcefully shoving the clinic manager into a waiting-room chair. *Id.* Harlow then slid to the floor, making room for the remaining coconspirators to enter. *Id.*

After Marshall successfully entered the clinic, she, Harlow, and Bell began distributing the locks and chains together. *Id.* After Bell affixed her own bike lock to her neck, Harlow quickly retrieved chains from the bag and passed it to Marshall. *Id.* Marshall, Bell, and Harlow immediately began to tie the chain to the two respective bike locks while Handy ordered various coconspirators to block certain doors. *Id.* As coconspirators moved waiting-room chairs to block the main entrance to the medical procedure area, Harlow and Bell passed the chain to others. *Id.* A few minutes later, Harlow and Bell had connected their chains to Smith and co-Defendant John Hinshaw as well, and the four of them sat in a row of chairs to block the entrance to the medical procedure area. *Id.*; Gov.'s Ex. 1004.

Police responded quickly, and Officer Whyte entered the clinic approximately fifteen minutes later.  Gov.'s Ex. 1004.  When Officer Whyte attempted to remove the chain connecting Harlow, Bell, Smith, and Hinshaw, Harlow and Marshall insisted that Officer Whyte would injure them if he tried.  Gov.'s Ex. 1011.  Harlow then tried a different tack, lecturing Officer Whyte that he "ha[s] a conscience" that should lead him to "let [the conspirators] stay" in the clinic to "save lives."  Gov.'s Ex. 1137.  At the same time, Ms. Jones, a patient seeking to terminate her pregnancy, pleaded with Harlow and the coconspirators blocking the medical procedure area.  Gov.'s Ex. 1011.  Harlow and her coconspirators would not let Ms. Jones through, Marshall shouting at Ms. Jones "welcome to the adult world!"  *Id*.  When another group of coconspirators blocked Ms. Jones from entering through an employee entrance, the blockade forced Ms. Jones to jump through a small window used to check patients into the clinic.  Gov.'s Ex. 1004.  Visibly angered, Marshall then moved from blocking the medical procedure door to sit directly in front of the small window.  *Id.*

Meanwhile, Darnel narrated the unfolding blockade on a Facebook livestream.  He began by explaining that, in the clinic, his coconspirators were conducting a "block and lock rescue" in which "ten pro-life people [including Harlow] [were] bonding together physically to prevent the murder of preborn babies."  Gov.'s Ex. 1017.  Darnel explained that Harlow and others were "intervening with their bodies" to engage in a blockade so disruptive that nothing like it had occurred "in over twenty-five years."  The purpose of this collective endeavor was "to prevent women from entering the clinic to murder their children."  *Id.*  This blockade was, in Marshall's words, her and Harlow's collective effort to "c[o]me to Washington, DC" to "stop the murder" and "rescue children."  10/25/23 Trial Trans. at 291:3-8.  The plan, however, was to "go down with the ship" when "police [began] to arrest people."  Gov.'s Ex. 1017.

7

When police began arresting the group, Harlow acted according to the plan discussed at the evening meeting and refused to cooperate. In order to prolong the disruption, she forced law enforcement to use a power-saw to cut the bike lock she affixed to her neck. Gov.'s Ex. 1015. When police attempted to place her in handcuffs and escort her out of the clinic, she went limp and fell prone. *Id.* When law enforcement asked if she would simply sit in a wheelchair to be wheeled out, she responded that she would "[]not cooperate. I'm sorry." Gov.'s Ex. 1138. The last to leave, Harlow caused the clinic to cease operations for approximately two-and-a-half hours.

### C. Defense Testimony

In support of her case, Defendant called herself, Marshall, and Bell as witnesses. Each provided testimony utterly belied by video evidence. For instance, as to Marshall, video evidence clearly shows her moving chairs. *See, e.g.*, Gov.'s Ex. 1004. When asked whether she moved chairs, even after viewing video evidence, she responded that she could not recall moving chairs. *See* 10/24/23 Trial Trans. at 253:20-24. Similarly, even after seeing video evidence of Handy in the clinic, Marshall testified that she did not see Handy in the clinic, despite standing a few feet away from her. *See id.* at 261:2-13. The pattern continued with Bell, who testified, contrary to video evidence, that Harlow entered the clinic before her, and that she placed a bike lock around her neck while on "the floor," despite having never laid on the floor (like Harlow did). *See id*. at 30:7-21. Similarly, Harlow insisted that she did not enter the clinic with a bike lock around her neck, even after watching video evidence that Harlow did, in fact, enter the clinic with a bike lock around her neck. *See id.* at 143:24-144:13. Because all three witnesses lied on the stand, the Court cannot find any of their self-serving testimony credible, and instead credits only their inculpatory testimony or testimony supported by other documentary evidence.

## II. CONCLUSIONS OF LAW

### A. Count One

To find a defendant guilty of conspiring against rights, in violation of 18 U.S.C. § 241, the Government must show that the defendant: (1) joined a conspiracy (2) to "injure, oppress, threaten, or intimidate any person" in the "free exercise or enjoyment" of a right or privilege guaranteed by "the laws of the United States." *See* 18 U.S.C. § 241; *United States v. Price*, 383 U.S. 787, 801-02 (1966). As the Court has already held, the FACE Act provides a right to provide or receive reproductive health services, including abortions, without obstruction by a private person. *United States v. Handy*, Crim. A. No. 22-096 (CKK), 2023 WL 4744057, at *3 (D.D.C. July 25, 2023). Additionally, as the Court explained in a prior opinion, the clause "injure, oppress, threaten, or intimidate" encompasses any conduct that is "intended to harm, frighten, punish, prevent, or obstruct a person's exercise or enjoyment" of a right guaranteed by federal law. *See United States v. Handy*, Crim A. No. 22-096, 2023 WL 6199084, at *2 (D.D.C. Sept. 22, 2023).

First, it is clear that Harlow conspired with others to obstruct access to reproductive health services at the clinic on October 22, 2020. That conspiracy began when Bell recruited Harlow to join in the upcoming blockade and, in Handy's words, "risk arrest." Video evidence demonstrates that Harlow planned with Bell to use locks and chains in advance of the event. Contrary to Bell's testimony, there is no indication on surveillance footage that Harlow was at all surprised to have a bike lock affixed around her neck outside the clinic. In fact, Harlow very clearly worked with Bell and Marshall to distribute locks and chains from a bag for which she had joint responsibility. Both video and photographic evidence establishes Harlow as co-owner of the bag. Harlow further joined the broader conspiracy when, consistent with Davis'

9

testimony, she joined the group effort to mount a "lock and block" rescue as agreed the evening before and morning of the blockade, a rescue in which, Handy explained the evening prior, Harlow would have to "risk arrest" to participate.

Second, video evidence clearly demonstrates that Harlow agreed with others to prevent and obstruct Ms. Jones from terminating her pregnancy that day. Darnel explained at the beginning of the blockade that a group of activists together intended to prevent patients from accessing pregnancy-termination services in the clinic. Harlow herself described on Officer Whyte's body-worn camera her purpose for chaining herself to three other activists directly in front of the main entrance to the area in which terminations are performed: to "rescue those who are being unjustly led to slaughter" by preventing the termination of a pregnancy in the clinic that day. If that were not enough to demonstrate the purpose of the conspiracy, Davis' testimony further explicates it.

Therefore, the Court finds that the Government has carried its burden beyond a reasonable doubt as to this charge and finds Defendant **GUILTY** on Count One.

### B. Count Two

To find a defendant guilty of obstructing access to a reproductive health clinic, the Government must show beyond a reasonable doubt that: (1) the defendant used force or physical obstruction; (2) the defendant intentionally injured, intimidated, or interfered with a patient or employees of the reproductive health clinic in their receipt or provision of reproductive health services; and (3) the defendant did so because a patient was receiving or an employee was providing such services. 18 U.S.C. § 248(a)(1); *Terry v. Reno*, 101 F.3d 1412, 1414 (D.C. Cir.

1996).[2]  As to the first element, it is clear that Defendant used both force and physical obstruction.

First, the record demonstrates that Defendant used both force and physical obstruction. The term "force" means "violent force capable of causing physical pain or injury to another person." *United States v. Handy*, No. 23-3143, 2023 WL 7277155, at *1 (D.C. Cir. Nov. 3, 2023) (unpublished).  "Physical obstruction" means "rendering impassable [or] unreasonably difficult or hazardous" "ingress to or egress from a facility that provides" among other things, abortion services.  18 U.S.C. § 248(e)(4).  Security camera footage shows Defendant, seeing that the clinic manager is attempting to prevent Defendant from further entering the clinic, Defendant purposefully fell on top of her, forcing the clinic manager downwards into a chair.  This video evidence is consistent with the clinic manager's testimony that Defendant "pushed [the clinic manager] back towards [a] chair" by "coming on top of [her]" with her "weight[.]" 10/24/23 Trial Trans. at 146:1-2, 204:3020.  It is inconsistent with Defendant's testimony that Defendant merely inadvertently fell.  *See* 10/25/23 Trial Trans. at 122:5-7.  As for physical obstruction, blocking the entry to the medical procedure area with a line of activists chained together clearly "renders impassable [or] unreasonably difficult or hazardous" that entryway.  As to the remaining elements, Defendant herself explained that she intentionally interfered with patients and employees of the clinic because they were seeking and providing, respectively, abortion services.  The Court therefore finds Defendant **GUILTY** on Count Two.

---

[2]  The operative indictment also charges aiding and abetting, and the Government asks the Court to find Defendant guilty on a theory of *Pinkerton* liability in the alternative.  Because the Court finds Defendant guilty as a principal, the Court need not reach these alternative theories of liability.

### III. CONCLUSION

This is not a close case. Overwhelming evidence demonstrates that Defendant conspired to obstruct access to abortion services at the clinic on October 22, 2020 and ultimately did so successfully. Accordingly, the Court finds Paula "Paulette" Harlow **GUILTY** on Counts One and Two.

Dated: November 16, 2023

                                                /s/
                                 COLLEEN KOLLAR-KOTELLY
                                 United States District Judge