**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 22-CR-96 (CKK)** |
| | : | |
| **PAULA "PAULETTE" HARLOW,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, hereby, submits this memorandum in support of its sentencing recommendation for Defendant Paula "Paulette" Harlow ("Harlow").

I.    **Introduction**

Harlow traveled from Massachusetts to Washington, D.C. with one goal: prevent women from accessing reproductive health care.  To accomplish that goal, on October 22, 2020, Harlow and her co-defendants invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") and used force and physical obstructions to interfere with access to the clinic.  During this blockade, Harlow brought a bag of locks into the clinic waiting room, pushed and shoved a clinic worker who tried to keep her out of the clinic, used the chains and locks she carried into the clinic waiting room to bind herself to co-defendant Joan Bell ("Bell"), refused to remove the bike lock around her neck, and went limp to prolong the group's efforts to obstruct access to the clinic. Harlow repeatedly yelled out to patient to bully them into leaving the clinic. Harlow was convicted by a jury of civil rights conspiracy and Freedom of Access to Clinic Entrances (FACE) Act offenses for her role in planning and executing the clinic blockade.

1

To address the gravity of her federal offenses and further the goals of the criminal justice system, the government recommends that the Court sentence Harlow to a term of incarceration at the low-end of Harlow's recommended Sentencing Guidelines range, which is 33-41 months at combined adjusted offense level 20 and criminal history category I.

## II.    Procedural Posture

On October 14, 2022, the grand jury returned a two-count superseding indictment, charging Harlow and her co-defendants with violating 18 U.S.C. § 241 (conspiracy against rights) and 18 U.S.C. § 248(a)(1) (FACE Act).   ECF No. 113.   These charges stemmed from Harlow's participation in a scheme to obstruct access to the Surgi-clinic - a women's reproductive health clinic - located in the District of Columbia, and her participation in the blockade of that facility on October 22, 2020.  After a bench trial before this Court, on November 16, 2023, Harlow was found guilty of both charges.  *See* Minute Entry, Sept. 15, 2023.  This Court also determined that Harlow had violated the FACE Act by both force and physical obstruction.  *Id*.

## III.    Overview of the Crimes

During trial, the Government presented the testimony of several witnesses and admitted approximately sixty exhibits into evidence. This evidence proved that the co-defendants collectively invaded the Washington Surgi-clinic ("Surgi-clinic" or "clinic") to block, for as long as possible, access to reproductive health care, and in doing so, injured one of the clinic's nurses and inflicted significant trauma on patients.

The evidence proved that the blockade of the clinic was planned and organized by individuals local to Washington, D.C., including co-defendants Lauren Handy ("Handy") and Jonathan Darnel ("Darnel").  Handy and Darnel advertised a call-to-action on social media, and

invited participants to join the planned blockade. *See, e.g.*, Exhibit Nos. 5066, 5082-83. Their co-defendants, along with other unindicted co-conspirators, traveled from out-of-state to participate in the October 22, 2020, Surgi-clinic blockade.

The co-defendants communicated about the planned blockade between October 7, 2020, and October 22, 2020, using social media, text messaging, phone calls, and in-person meetings. *See, e.g.*, Exhibit Nos. 3005, 4001A, 5066, 5070, 5072, 5083, 5091, 7361, 7362; 10/25/23 Trial Tr. at 158:5-12,159:3-163:2. The co-defendants communicated that the purpose of the planned Surgi-clinic blockade was to stop the clinic from providing, and patients from obtaining, reproductive health services. *Id.* In planning the blockade, Handy also scheduled a fake patient appointment at the clinic for October 22, 2020, under the name "Hazel Jenkins," to gain access to the clinic facility. *See, e.g.*, Exhibit No. 5053; 10/23/23 Trial Tr. at 83:6-11.

Handy also made lodging arrangements for the blockade participants who traveled to Washington, D.C. from other states, including co-defendants: Jay Smith ("Smith"), John Hinshaw ("Hinshaw"), and William Goodman ("Goodman") from New York; Heather Idoni ("Idoni") from Michigan; Joan Bell ("Bell") from New Jersey; and Jean Marshall ("Marshall") and Harlow from Massachusetts. *See, e.g.*, Exhibit Nos. 4001A, 5002, 5091. Additionally, Handy procured monetary donations to pay for an Airbnb lodging reservation at 133 Quincy Place NE, Washington D.C. that she made for herself and co-defendant Geraghty who traveled to Washington, D.C. from Pennsylvania on October 21, 2020, to participate in the Surgi-clinic blockade. *See, e.g.*, Exhibit Nos. 4001A, 5001, 5002, 5021, 5091.

The night before the planned clinic blockade, the ten co-defendants – led by Handy and Darnel – discussed the plan for and execution of the blockade. *See, e.g.*, 10/24/23 Trial Tr. at

3

22:11-23:24.  At the meeting, Handy and Darnel further discussed the Surgi-clinic's layout and floor plan so that each blockade participant knew which clinic doors to blockade.  *Id.*, at 25:21-24. The group further discussed using locks and chains to block the Surgi-clinic doors, and the consequences of participating in the blockade, which included being arrested by the police and charged with criminal offenses.  *Id.*, at 25:21-24, 28:25-29:25.

On October 22, 2020, the group met again outside a coffee shop near the clinic to have one last discussion as to the planned blockade.  *See e.g.*, 10/25/23 Trial Tr. at 107:1-5 (suggesting meeting place was outside a "coffee house" or "restaurant"); *see also* Exhibit Nos. 2015, 2017. Co-defendant Joan Bell brought to this final meetup a bag containing the chains, locks, and ropes. *Id.*, at 27:23-24.  After additional discussion, the group departed for the clinic to begin successfully obstructing the clinic's operations.  *See, e.g.*, 10/24/23 Trial Tr. at 63:18-21.

The co-defendants and other unindicted co-conspirators arrived at the Surgi-clinic shortly before it was scheduled to open the morning of October 22, 2020.  While several co-defendants hid in the Surgi-clinic's fourth floor building stairwell, Handy and Bell waited outside of the clinic's patient entrance.  *See, e.g.*, 10/25/23 Trial Tr. at 122:6-11; Exhibit No. 1079A.  Handy approached "Sasha Proctor," a medical specialist working at the clinic, in the hallway outside of the clinic and falsely represented herself as "Hazel Jenkins" and stated that she had a medical appointment.  Moments later, Darnel's co-defendants who hid in the building's stairwell approached the Surgi-clinic's patient entrance.  *See, e.g.*, Exhibit Nos. 1008, 1079A.

Goodman carried the bag of chains, locks, and ropes from the stairwell and placed it on the floor just outside of the Surgi-clinic's patient entrance.  *Id.*  Bell retrieved a bicycle lock from that bag and forcefully entered the clinic.  *Id.*  Harlow picked the bag up and forcefully entered the

clinic behind Bell.  Harlow wore a bicycle lock around her neck in anticipation of using it to chain herself to Bell and other co-defendants as they blocked the Surgi-clinic's doors.  *See, e.g.*, Exhibit Nos. 1016, 1079A.

Moments before the Surgi-clinic was scheduled to open at 9:00 a.m., as the co-defendants gathered outside of the Surgi-clinic's patient entrance, Darnel – who was outside of the clinic's building - announced an imminent reproductive health clinic blockade on social media and prepared to livestream the event.  *See, e.g.*, Exhibit Nos. 1017-20, 1022-1024, 1026.  Darnel used one of his Facebook accounts to create an event he titled, "No one dies today," and captioned it, "Starting soon!  Tune in!"  *See, e.g.*, Exhibit No. 3001.

At approximately 9:00 a.m., Ms. Proctor unlocked the door to admit the waiting patients with scheduled appointments.  At that time, the co-defendants (with the exception of Darnel who was outside of the building livestreaming the event) forcefully entered through the Surgi-clinic's entrance.  *See, e.g.*, Exhibit Nos. 1008, 1079A.  Co-defendant Smith, who stood at the door when it was unlocked, forcefully pushed the door open as Ms. Proctor attempted to close the door to prevent the co-defendants from entering.  *Id.*  The co-defendants collectively pushed and shoved their way in and against the clinic staff who attempted to keep the co-defendants from entering.  *Id.*

As co-defendant Smith forced his way into the clinic, he pushed clinic nurse "Sara Compton" causing her to sprain her ankle and suffer bodily injury.  *See e.g.*, Exhibit No. 1001; 10/23/23 Trial. Tr. at 45:23-25. Co-defendants Marshall and Geraghty pushed and shoved against Ms. Proctor.  And, as Harlow intentionally pushed her way into the clinic, she caused "Tina Smith," the clinic's administrator, to fall backwards and into a chair.  *See, e.g.*, Exhibit No. 1008.

After forcing their way into the clinic's waiting room, the co-defendants set about physically blockading the Surgi-clinic doors. *See e.g.*, Exhibit No. 1001. Handy directed the blockaders on what to do. *Id*. Hinshaw and Marshall moved chairs in the Surgi-clinic's waiting room to block doors that led to the clinic's treatment areas. *Id.* Harlow, who entered the clinic with the bag of locks, chains, and rope, worked with Smith, Hinshaw, and Bell to intentionally bind themselves together using the chains, ropes and bicycle locks, and they sat in chairs against the Surgi-clinic's interior doors. *Id.* Marshall assisted Harlow, Smith, Hinshaw, and Bell with using the locks and chains to bind themselves together. *Id*. Goodman and Idoni went into the hallway outside of the Surgi-clinic and stood in front of another clinic doorway that was used as an employee entrance. *See, e.g.*, Exhibit Nos. 1008, 1016, 1020, 1079B.

During the blockade, "Ashley Jones," a patient at the clinic, was unable to access the treatment area because co-defendants Bell, Harlow, Smith, Hinshaw, and Marshall blocked the clinic's doors. *See, e.g.*, Exhibit Nos. 1008, 1016. Ms. Jones was forced to climb onto a chair and through a receptionist window in the waiting room to access the Surgi-clinic's treatment area, which was where the clinic staff remained during the co-defendants' blockade. *Id.*

A second patient, "Shampy Holler," was also unable to access the clinic's treatment area because of the co-defendants' blockade. *See, e.g.*, 9/12/23 Trial. Tr. at 14:22-25. Mrs. Holler, who was experiencing labor pains and in need of immediate medical attention, was forced to lay on the hallway floor outside of the clinic because the co-defendants refused to allow her and her husband to enter. *Id.*, at 15:1-2. At one point as Mrs. Holler lay on the ground, she was accosted by Marshall. *See, e.g.*, Exhibit No. 1079B. As Mrs. Holler attempted to get up from the floor, Marshall pushed Mrs. Holler back down to the floor in order to prevent her from entering into the

facility.  *Id.*; *see also* 9/12/23 Trial. Tr. at 21:7-9.  After a short time, the clinic staff managed to open the staff entrance briefly and were able to get Mrs. Holler into the clinic.  *Id.*, at 21:16-19.

Throughout the entire blockade, Darnel livestreamed the event on social media.  *See, e.g.*, Exhibit Nos. 1017-1019, 1022-1024, 1026.  Additionally, he assisted his co-defendants in prolonging the blockade by secreting the keys to the bicycle locks used to bind several blockading co-defendants together to an unindicted co-conspirator who was outside of the clinic building.  *See* Exhibit No. 1024.  Darnel did this in order to delay the blockading co-defendants' inevitable arrests by responding Metropolitan Police Department ("MPD") officers.

The co-defendants remained within the Surgi-Clinic's waiting room for several hours blocking the doors in an effort to interfere with the provision of abortion services.  They refused to move or leave the clinic when asked by the clinic's staff and responding police officers.  *See, e.g.*, Exhibit No. 1016.  The co-defendants were very vocal about their blockade, and their reasons for preventing access to the Surgi-clinic.  For example, Handy explained to the first responding MPD officers, "[the co-defendants] were doing a rescue . . . . On the fourth floor is an abortion facility and so today [the co-defendants] are blocking it . . . to not allow people to go inside . . . . [t]o stop abortions today."  *See* Exhibit No. 1009.  Similarly, while sitting in a chair blocking access to the clinic's treatment area, Harlow explained to one MPD officer, "We can't move. We have permanent locks."  *Id*.  Harlow then further lectured that same officer, telling him that he "ha[s] a conscience" that should lead him to "let [the co-conspirators] stay" in the clinic to "save lives."  *See* Exhibit No. 1137.

After refusing the requests to move or leave the Surgi-clinic, the defendants were advised that they would be arrested.  With the exception of Darnel and Geraghty – who left the clinic

moments before arrests were made, the remaining defendants were arrested. They passively resisted arrest by going limp, including when the police cut the bicycle locks that Bell and Harlow wore around their necks and placed them under arrest. *See, e.g.*, Exhibit No. 1016. The arrested defendants were carried out of the building and into transport vehicles.

In short, the testimony and exhibits presented proved that the defendants refused to move or leave the clinic because it was their intention to interfere with the Surgi-clinic's patients from obtaining, and the clinic staff from providing, pregnancy termination services. The defendants' participation in the planned blockade interfered with Ms. Jones, Mrs. Holler, and other patients from accessing the Surgi-clinic, and further interfered with the clinic staff's ability to provide reproductive health services.

## IV.    Harlow's Criminal Conduct

The evidence at trial proved that Harlow was an active participant in the conspiracy and blockade at the Surgi-clinic. Harlow recruited her sister, co-defendant Marshall, to join the blockade, *see* 10/25/23 Trial Tr. at 250:17-23, and then volunteered her vehicle and drove with Marshall from her home in Massachusetts to Washington, D.C., stopping along the way to pick up defendants Bell and Goodman, to participate in the blockade. *See* 10/26/23 Trial Tr. at 20-21, 105-06. Once in Washington, D.C., Harlow attended the pre-invasion meeting, 10/24/2024 Trial Tr. at 28-29, where she listened to Handy and Darnel discuss the plan—including who planned to risk arrest, the consequences of the FACE Act, and the tactics the invaders could use to delay arrest. *See id.* at 21-32.

Harlow met her co-defendants at a location near the clinic the morning of the blockade. After a final meeting to walk-through the plan, discuss the clinic's layout, and how the blockaders

would enter the facility, Harlow walked with the other blockading co-defendants to the Surgi-clinic, where she hid in the stairwell until the clinic opened, buying time for Handy and co-defendant Bell to pose as a clinic patient ("Hazel Jenkins") and companion. *See* ECF No. 474 at 5 (citing 10/25/23 Trial Tr. at 122:6-11; Exhibit No. 1079A).

When the clinic door opened for the first scheduled appointments, which included Handy's fake "Hazel Jenkins" appointment, Harlow carried the bag of chains and along with her co-defendants forced entry into the facility. *See* Exhibit 1079A at 21:05:30-40. Refusing to be denied entry, with a bike lock around her neck and the bag of chains around her arm, Harlow pushed and shoved clinic employee Tina Smith, causing her to fall backwards into a chair. *See* Exhibit No. 1001 at 21:05:50-26:00. Harlow did not waste any time. She took the bike lock and chains out of the blue bag she carried with her, chained herself to Bell, sat in a chair blocking access to the treatment area door, and refused to move. *See id.* at 21:07:00-13:10.

Despite seeing and hearing Ms. Jones' distress, Harlow refused to move. Harlow repeatedly refused to follow law enforcement's requests to leave the clinic, explaining to Officer Homere Whyte, for example, that she and her codefendants were locked and chained together and could not move. *See id.* at 09:25:25-25:55. Harlow did not just sit quietly. She screamed out with the intent to intimidate clinic staff and patients. *See e.g.*, Exhibit No. 1022.

Harlow further delayed access to the clinic by repeatedly refusing to cooperate with law enforcement. She refused to unlock the bike lock around her neck, forcing MPD to call for a "breach kit." *See* Exhibit No. 1015. After MPD successfully cut off the bike lock, Harlow went limp—a tactic to delay her removal that was discussed the night before at the pre-invasion meeting. *See id.* Harlow was in the clinic waiting area for approximately two and a half hours—her actions

9

were methodical, deliberate, and harmed clinic staff and patients seeking the health care they needed.

## V.    Harlow's Trial Testimony

Harlow was one of five Defendants who chose to testify at their respective trial.  Harlow's testimony concerning the blockade was "utterly belied by video evidence." *Id.*, at 8. For example, Harlow testified that she did not enter the clinic with a bike lock, *see* 10/26/2023 Trial Tr. at 143:21-151:5, despite clear evidence to the contrary, *see* Exhibit No. 1079A. As another example, Harlow refused to acknowledge she was responsible for carrying the bag of locks into the clinic, *see* 10/26/2023 Trial Tr. at 154:14-156:3, even when confronted with indisputable video evidence, *see* Exhibit No. 1001. The evidence is clear that Harlow discussed the blockade with Marshall and Bell, and the three of them collectively decided to join the blockade by traveling to D.C. together, and that they would use locks and chains to block the clinic's entrance.  *See* ECF No. 474 at 3. This Court found that Harlow "lied on the stand," and that her "self-serving testimony" was incredible.  ECF No. 474 at 8.

## VI.    Statutory Penalties

The two counts, for which Harlow and her co-defendants were convicted, carry the following statutory penalties:

Count 1:  Conspiracy against Rights, in violation of 18 U.S.C. § 241, carries a maximum sentence of 10 years' incarceration;

Count 2:  Clinic Access Obstruction, in violation of 18 U.S.C. § 248(a)(1) & (b), carries a maximum sentence of 12 month's incarceration.

## VII.   Sentencing Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 45 (2007); *Rosales-Mireles v. United States*, 585 U.S. 129, 133 (2018) ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.") (internal quotations and citations omitted).  "[T]he Guidelines remain the foundation of federal sentencing decisions. *Hughes v. United States*, 584 U.S. 675, 685 (2018).  "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.  The Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46.

The government agrees with the Sentencing Guidelines calculation set forth in the Presentence Investigation Report ("PSR"). ECF No. 525.  Harlow's Base Offense Level for both of her counts of conviction is 12.  PSR at 13-15.  And her Base Offense Level is adjusted as follows:

| Guideline | Description | Adjustments |
|---|---|---|
| § 2H1.1(a)(2) | Where the offense involved two or more participants | 12 |
| § 3A1.1(b)(1) | Vulnerable victim[1] | 2 |
| § 3A1.3 | Restraint of victim[2] | 2 |

---

[1]    This adjustment is applicable because Ms. Jones and Mrs. Holler were pregnant and unusually vulnerable due to their physical condition. *See, e.g.*, *United States v. James*, 139 F.3d 709, 714-15 (9th Cir. 1998) (Affirming the trial court's application of the vulnerable victim adjustment where the defendant threatened a pregnant bank teller during the commission of a bank robbery).

[2]    "Physically restrained" means the forcible restraint of the victim *such as* being tied, bound, or locked up.  U.S.S.G. §1B1.1 (Application note 1(K)) (emphasis added).  The use in the definition of "such as" indicates that the terms are merely illustrative examples and do not limit

| § 3C1.1 | Obstructing or impeding the administration of justice[3] | 2 |
|---|---|---|
| § 3D1.4 | Combined offense level for two equally serious groups | 2 |
| | | |
| **Combined Adjusted Offense Level** | | **20** |

*See id.* Harlow has no criminal history, which places her in Criminal History Category I. *See* PSR at 15, ¶ 98. Accordingly, Harlow's Guidelines sentencing range is 33-41 months.

## VIII.   Section 3553(a) Sentencing Factors

The Court should next consider the sentencing factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50.  That Section provides that Court consider the following:  (A) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id*.; (C) promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (D) general and specific "deterrence," 18 U.S.C. § 3553(a)(2)(B)(C); (E) the Guidelines and Guideline range, § 3553(a)(4); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

### A.    Nature and Circumstances of the Offenses

The first factor this Court should consider is the nature and circumstances of the offense; both support a significant sentence for Harlow.  Harlow participated in a reproductive health clinic blockade involving numerous participants with the goal to prevent patients from obtaining, and providers from providing, abortion services.

---

the type of conduct that may constitute a physical restraint.  *Arcoren v. United States*, 929 F.2d 1235, 1246 (8th Cir. 1991) (Restraint of victim adjustment applied in case where the victims were pushed into a room and prevented from leaving); *see also United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (same).

[3]      This upward adjustment is appropriate because Harlow committed perjury at trial.

Harlow's participation in the blockade was significant. Among other things, Harlow volunteered her car and traveled with Marshall from Massachusetts, stopping along the way to pick up Bell and Goodman, to Washington, D.C. to block access to reproductive health care. Harlow knew that the purpose of the Surgi-clinic blockade was to prevent the provision of pregnancy termination services, and refused to let clinic staff or the pain of the clinic patients stop her from accomplishing that goal. Harlow carried the bag of lock and chains from the stairwell, where she hid with her co-defendants, and then, with the bag of lock and chains on her arm and a bike lock around her neck, she pushed and shoved her way into the clinic, causing a clinic staff member ("Tina Smith") to fall down. She took the bag of lock and chains and helped chain herself to defendant Bell. She then sat in a chair in front of the clinic's treatment area door and refused to move—ignoring the pleas of clinic staff members and patients, and law enforcement commands. Despite the clear anguish Harlow and her codefendants were causing patients and clinic staff, Harlow did not sit quietly. She repeatedly shouted harassing and intimidating statements. Harlow further delayed her removal from the clinic—preventing the clinic from providing and patients from accessing reproductive health care for even longer—by forcing law enforcement to find a breach kit, saw the bike lock off her neck, and going limp.

A prison sentence within the Guidelines range would account for Harlow's serious offenses. Her strongly held anti-abortion beliefs led her to travel to D.C. to participate in an organized clinic blockade. The blockade, which was broadcast to an on-line audience, encouraged others to commit similar crimes, publicized Harlow's own offense, and traumatized the victims. The blockade will have lasting impacts on the clinic's patients, including, Ms. Jones, Mrs. Holler, and the clinic staff, which they will likely struggle with life-long. For this reason, this factor

supports a significant sentence.

    B.    *The History and Characteristics of the Defendant*

Harlow acknowledged having strongly held anti-abortion views and participating in numerous rescues in the past. *See* 10/26/2023 Trial Tr. at 99:24-101:1; 127:23. Harlow's actions on October 22, 2020, were a clear escalation—an escalation for which Harlow showed no remorse. As such, Harlow's history and characteristics support the imposition of a Guidelines sentence.

It is indisputable that Harlow suffers from several chronic medical ailments. These ailments, however, did not stop Harlow from traveling from Massachusetts to Washington, D.C. to participate in the invasion, and entered the Surgi-clinic with one goal: prevent patients from exercising their reproductive health care rights. Harlow was aggressive in her pursuit of this goal and never wavered. When the clinic staff tried to keep the invaders out of the clinic to protect their patients, Harlow did not back down. Instead, she pushed and shoved her way in with a bike lock around her neck and the bag of chains around her arm, ultimately pushing with such force that Ms. Smith fell backwards into a chair. Harlow wasted no time taking the chains out of her bag and helped chain herself to co-defendant Bell and the chairs that had been rearranged in front of the treatment area door. Once sitting in a char blocking the treatment area door, while chained to Bell, Harlow used the power of her voice to intimidate and harass patients and clinic staff members. She also repeatedly ignored law enforcement commands to leave, forcing officers to find a breach kit and saw the bike lock off her neck. Even then, Harlow refused to listen to law enforcement. Clearly not impacted by her medical ailments—and certainly showing no symptoms of medical ailments— Harlow used a tactic discussed at the pre-invasion meeting the night before and purposefully fell to the ground and went limp, leaving officers no choice but to pick her off the ground and place

her in a wheelchair. Harlow was in the waiting room the longest because of her delay tactics, blocking access to reproductive health care for approximately two and a half hours.

In requesting a delay of her trial, Harlow indicated that her medical conditions have worsened. These medical conditions did not, however, prevent Harlow from spending hours in a van traveling to and from her vacation home in Canada on the eve of her original trial date. Furthermore, as indicated in the PSR, Harlow explained that she has difficulty walking, uses a wheelchair, and must lie down to relieve pressure. ECF No. 525 at 18, ¶ 117. There is nothing even remotely suggesting that Harlow's conditions cannot be suitably treated by the Bureau of Prisons. As indicated in the PSR, Harlow will be appropriately evaluated and assigned a level of care appropriate for her medical conditions. *See id.* at 19, ¶ 119.

While testifying in her own defense, Harlow lied repeatedly even in the face of indisputable evidence. She showed for no remorse for her actions and refused to acknowledge how her actions impacted the clinic staff and the clinic patients. Accordingly, a Guidelines sentence would appropriately address Harlow's escalating conduct and personal characteristics of using force to further her criminal objectives.

## C.    *Promotion of Respect for the Law*

Considering the gravity of the offenses, a significant sentence in this matter is necessary to reflect the seriousness of the offense and promote respect for the law. *See Gall*, 552 U.S. at 54 (recognizing that "a lenient sentence for a serious offense threatens to promote disrespect for the law"). A Guidelines sentence is appropriate in this case because Harlow was part of a large group that planned and blocked access to a reproductive health clinic in D.C. Harlow planned with others to "injure, oppress, threaten, and intimidate" the clinic's patients and providers from exercising

their reproductive health rights free from violence and obstruction. *See* Superseding Indictment, ECF No. 113. As established at trial, Harlow understood that she had agreed with her co-defendants to commit a crime, and that it was a violation of the FACE Act. She and her co-defendants were prepared to be arrested knowing the consequences of their actions. Harlow's clinic blockade involved the use of force, which resulted in Ms. Compton suffering bodily injury and prevented Mrs. Holler, who was suffering from labor pains, from getting up off the floor and entering the clinic. The physical obstruction was especially traumatic for the clinic patients who testified at trial, which was apparent during the offense and their emotional trial testimony. *See*, *e.g.*, Exhibit No. 1011.

Harlow faced clear choices with regards to her activism: to engage in criminal conduct or engage in lawful protest. Harlow and her co-defendants' used force to take control of the Surgi-clinic and obstructed access to the facility. The trial evidence proved that Harlow appreciated the criminality of her conduct in committing a crime by blockading the clinic, and that despite knowing the consequences of her actions, she chose to violate federal laws. All of Harlow's choices, and her escalating conduct, point to the obvious need for a low-end Guidelines sentence that will promote respect for the law.

### D.    General and Specific Deterrence

Imposition of a significant sentence is necessary to provide for both general and specific deterrence. "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime." *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017) (noting that "harsh sentences" "generally operate as strong deterrents");

*United States v. Diaz-Navarro*, 567 F. App'x 256, 257 (5th Cir. 2014) (since defendant had committed offense before and received a light sentence a "'long incarceration period'" was necessary for deterrence); *United States v. Rivera*, 488 F. App'x 225, 227 (9th Cir. 2012) (harsh sentence necessary for deterrence in light of defendant's recidivism).

First, a significant sentence is necessary "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. 3553(a)(2)(B). Sentencing Harlow to a period of incarceration would deter other abortion extremists (whether pro-life or pro-choice) from obstructing access to reproductive health services. The general deterrent effect would be significant because the instant case has been widely followed by anti-abortion extremists, and a low-end Guidelines sentence would broadcast a strong message to other would-be criminal actors similarly situated to Harlow.

Second, a significant sentence is also necessary for specific deterrence. In light of Harlow's strongly held beliefs, and willingness to escalate her actions to prevent access to reproductive healthcare, a prison sentence particularly at her current age, will prevent her from engaging in future violations of federal law.

Without imposition of a significant Guidelines sentence here, Harlow and other would-be violators will not be discouraged from engaging in misconduct and may believe that there are relatively minimal consequences for flagrantly committing crimes that target the provision of reproductive health care.

E.    *The Sentencing Guidelines*

Examination of the Section 3553(a) factors shows that a low-end Guidelines sentence is appropriate in this case. While a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338,

351(2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50;

*Nelson v. United States*, 555 U.S. 350, 350 (2009), "even in an advisory capacity the Guidelines

serve as 'a meaningful benchmark' in the initial determination of a sentence and 'through the

process of appellate review.'" *Rosales-Mireles*, 585 U.S. at 133.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S.

at 349.  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in

the interests of greater rationality, avoiding inconsistency, complying with congressional

instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. §

994(m).  In so doing, the Commission "has the capacity courts lack to 'base its determinations on

empirical data and national experience, guided by professional staff with appropriate expertise,'"

and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at

108.  As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing
> Commission's in-depth research into prior sentences, presentence investigations,
> probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro,
> comment 3.  More importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's on-going approval of
> Guidelines sentencing, through oversight of the Guidelines revision process.  *See*
> 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the
> Guidelines).  Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.  Because they have
> been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).

In light of Harlow's conduct in this case, a Guidelines sentence would be reasonable and

appropriate for both counts of conviction. A guidelines sentence in this case would be 31 to 41 months—a significantly less amount of time than the maximum allowable sentence for her counts of conviction (Count One statutory maximum sentence of 10 years; Count Two statutory maximum sentence of 12 months). Such a sentence would be reasonable because it appropriately accounts for her conduct in the Surgi-clinic blockade—pushing and shoving her way into the clinic with the bag of chains on her arm and the bike lock around her neck, her use of force causing Ms. Smith to fall down, chaining herself to co-defendant Bell and the chairs blocking access to the clinic's treatment area, her harassing and intimidating shouting, and her actions to delay removal from the waiting room. And, it would be sufficient, but not greater than necessary, to comply with the basic aims of Section 3553(a). *Rita*, 551 U.S. at 348.

F.      *Unwarranted Sentencing Disparities*

This Court should impose a guidelines sentence to avoid any unwarranted sentencing disparity. 18 U.S.C. § 3553(a)(6); *see, e.g.*, *Molina-Martinez v. United States*, 578 U.S. 189, 193 (2016) ("Uniformity and proportionality in sentencing are achieved, in part, by the Guidelines' significant role in sentencing"); *United States v. Alford*, 89 F.4th 943, 953 (D.C. Cir. 2024) ("Thus, '[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.'"); *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2024) (same).

Although Harlow and her co-defendants in this case, along with co-defendants from one other recently charged unrelated case from the Middle District of Tennessee (*see United States v. Gallagher*, et al., 22-cr-327 (M.D.TN)), will be the first groups of coo-defendants sentenced for conspiring to violate reproductive health rights, they all are similarly situated to other Section 241

convicted co-defendants who received Guidelines sentences where the objects of their civil rights conspiracy targeted other federally protected rights. *See, e.g.*, *United States v. Liddy*, 542 F.2d 76, 78 (D.C. Cir. 1976) (Defendant convicted of violating Section 241 (Fourth Amendment right at issue) sentenced to a term of imprisonment from one to three years); *United States v. Stewart*, 65 F.3d 918, 931-32 (11th Cir. 1995) (Court imposition of a Guidelines sentence in a Section 241 prosecution affirmed (42 U.S.C. § 3631 housing rights at issue)); *United States v. Whitney*, 229 F.3d 1296, 1309 (10th Cir. 2000) (same); *United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003) (affirming Guidelines sentence for Section 241 conviction with right at issue was denial of public accommodations because of race); *United States v. McCoy*, 480 F.App'x 366, 373 (6th Cir. 2012) (Guidelines and statutory maximum sentence imposition affirmed for convictions of Sections 241 and 242). Therefore, a Guidelines sentence for Harlow would not result in any sentencing disparities.

The government also strongly opposes any requested variance from the Sentencing Guidelines. Harlow's conduct showed a flagrant disregard for women's reproductive health rights, and the lack of concern for Ms. Jones and Ms. Holler who, for example, sought care during a particularly sensitive time in their lives. Combined with the other sentencing factors, a low-end Guidelines sentence would serve all of the Section 3553(a) factors.

## IX.    Requested Sentence

The government recommends that the Court impose a sentence at the low-end of Harlow's Guidelines Sentencing range, which is 31-41 months. The advisory Guidelines Sentencing range should be given considerable weight. First, the Guidelines range is itself a § 3553(a) factor. "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the

premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50, n.6.  Second, one of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)."  28 U.S.C. §§ 991(b)(1)(A), 994(f).  The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita*, 551 U.S. 338, 350.  "[W]here judge and Commission both determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347.  In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.[4]

Harlow was a key participant in the instant offense. Harlow not only capitalized on her victimization of vulnerable victims, she and her co-defendants promoted and publicized her crimes.  Harlow also committed perjury and has not demonstrated any willingness to find lawful ways to advance her beliefs. Here, a sentence at the low-end of the Guidelines will achieve a

---

[4]    The government disagrees with Probation's recommendation for a downward variance. ECF No. 520.  Their recommendation is based on the following:  (1) the nature of the circumstances of the offense, and (2) to avoid unwarranted sentence disparities. *Id.* at 3.  As set forth above, the government believes that the nature and circumstances of the offenses – attempting to deny the receipt of reproductive health care and intentionally inflicting physical and mental pain on patients – merits a Guidelines sentence; and, as the D.C. Circuit has held, imposing a Guidelines sentence is the best way to avoid unwarranted sentencing disparities.

sentence that reflects the Sec. 3553 factors. In particular, such a sentence reflects the gravity of the offense (to include vindicating the rights of those whom Harlow victimized), the need for deterrence, and the absence of any mitigating factors.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052
*/s/ Rebecca G. Ross*
REBECCA G. ROSS
NY Bar No. 5590666
JOHN CRABB JR.
NY Bar No. 2367670
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20001
john.d.crabb@usdoj.gov

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION
*/s/ Sanjay H. Patel*
SANJAY H. PATEL
IL Bar. No. 6272840
Trial Attorney
Criminal Section, Civil Rights Division
Email: Sanjay.Patel@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this memorandum has been filed and served upon all parties listed on the Electronic Case Filing (ECF) System and is available for viewing and downloading from the ECF system.


*/s/ Rebecca G. Ross*
REBECCA G. ROSS
Assistant United States Attorney